AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)

**LODGED**
CLERK, U.S. DISTRICT COURT

07/13/2020

CENTRAL DISTRICT OF CALIFORNIA
BY: ____DM____ DEPUTY

# UNITED STATES DISTRICT COURT

for the

Central District of California

**FILED**
CLERK, U.S. DISTRICT COURT

7/13/2020

CENTRAL DISTRICT OF CALIFORNIA
BY: ____bm____ DEPUTY

United States of America

v.

TRAVIS SMITH,

Defendant.

Case No.  2:20-mj-03235

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of July 6-11, 2020, in the county of Los Angeles in the Central District of California, the defendant(s) violated:

| Code Section | Offense Description |
| --- | --- |
| 18 U.S.C. § 1201: | Kidnapping |
| 18 U.S.C. § 2422: | Enticement of a Minor to Engage in Criminal Sexual Activity |
| 18 U.S.C. § 2423: | Transportation with Intent to Engage in Criminal Sexual Activity With a Minor and Travel with Intent to Engage in Illicit Sexual Conduct With a Minor |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

*DEAGLAN RYAN*
*Complainant's signature*

Deaglan Ryan, Special Agent - FBI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:  July 13, 2020

*Judge's signature*

City and state:  Los Angeles, California

Hon. Jean P. Rosenbluth, U.S. Magistrate Judge
*Printed name and title*

## **AFFIDAVIT**

I, Deaglan P. Ryan, being duly sworn, declare and state as
follows:

### **I. PURPOSE OF AFFIDAVIT**

1.    This affidavit is made in support of a criminal
complaint against TRAVIS SMITH ("SMITH") for violations of 18
U.S.C. § 1201: Kidnapping; 18 U.S.C. § 2422: Enticement of a
Minor to Engage in Criminal Sexual Activity; and, 18 U.S.C.
§ 2423: Transportation with Intent to Engage in Criminal Sexual
Activity With a Minor and Travel with Intent to Engage in
Illicit Sexual Conduct With a Minor ("the SUBJECT OFFENSES").

2.    This affidavit is also made in support of an
application for a warrant to search:

a.    SMITH'S cellular telephone (the "SUBJECT
DEVICE"), seized by law enforcement, pursuant to the arrest of
SMITH, on Saturday, July 11, 2020.  The SUBJECT DEVICE is an LG
Stylo 5 cellular telephone, encased in a black and red
protective cover, bearing model number is LM-Q720PS and serial
number 911CQFT1046043, as described further in Attachment A-1;
and

b.    SMITH's person, as described further in
Attachment A-2, for his DNA, as described further in Attachment
B-2.

3.    The requested search warrant seeks authorization to
seize evidence, fruits, or instrumentalities of violations of
the SUBJECT OFFENSES, as described more fully in Attachment B-1
and Attachment B-2, which are incorporated herein by reference.

4.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and search warrant, and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

5.    I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI") and have been so employed since September 2009.  I am currently assigned to Squad C2, the Violent Crimes Against Children ("VCAC") squad in the Los Angeles Field Office, as well as to a multi-agency child exploitation task force known as the Southern California Regional Sexual Assault Felony Enforcement ("SAFE") Team.  In this capacity, I have been tasked with investigating crimes involving the sexual exploitation of children under Title 18, United States Code, Section 2251, et seq.  I was previously assigned to the New York Field Office as a Special Agent in the FBI's Health Care Fraud Task Force.  I have received 22 weeks of formal education at the FBI Academy, which included instruction in writing affidavits and providing evidentiary testimony.  In support of my current assignment, I have gained familiarity in child exploitation investigations through formal on-the-job training with more experienced agents

and received training and experience in interviewing and interrogation techniques, arrest procedures, search warrant applications, surveillance, and a variety of other investigative tools available to law enforcement officers.  As an FBI SA, I have conducted surveillance; participated in the execution of search warrants; debriefed informants, confidential sources, and cooperating witnesses; reviewed recorded conversations; and participated in the interception of wire and electronic communications.

6.    In addition, I have received on-the-job training in the sexual exploitation of children, observed and reviewed images of child pornography in many forms of media, including computer and digital media, and participated in interviews and debriefings of persons involved in the sexual exploitation of children.  I have conducted and participated in investigations related to the sexual exploitation of children, which have resulted in the arrest and prosecution of individuals.

7.    As part of my training as a member of the VCAC Squad and SAFE Team, I have consulted with colleagues who have many years of experience investigating child prostitution, child pornography, and child exploitation cases.  I have also been involved in the execution of numerous search warrants related to various crimes, including child pornography and child prostitution offenses.

8.    Through my training and experience, I have become familiar with the methods of operation used by people who commit offenses involving the sexual exploitation of children and how

people use the Internet to commit crimes arising from, and related to, the sexual exploitation of children.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

9.     Several months ago, while living in Los Angeles County, 26 year-old SMITH began online chatting with a girl ("Minor Victim") who he knew was 15 years-old.

10.    SMITH demanded Minor Victim to send him explicit images and videos of herself.  Minor Victim complied because SMITH threatened to harm both her and her family if she did not. Minor Victim attempted to cut off communication with SMITH on numerous occasions, but SMITH continued threatening her and her family.

11.    Eventually, SMITH drove with two unknown males from Los Angeles to Oregon to obtain Minor Victim.  Minor Victim did not want to leave her family, but SMITH threatened to "shoot up" Minor Victim's family's home if she did not comply; Minor Victim said she would not have left if SMITH had not threatened her. On July 7, 2020, SMITH began driving Minor Victim from Oregon to Los Angeles.

12.    After arriving in Los Angeles, SMITH had sex with her multiple times, including digital and penial vaginal penetration, oral copulation, and possibly anal penetration. SMITH also hit her, pinned her to a bed, grabbed her by the throat, and burned her with a lighter.  SMITH threatened to kill, shoot, and stab her if she did not comply, and refused to allow her to leave his apartment or call her family.  On July

11, 2020, law enforcement officers recovered victim and arrested SMITH.

## IV. TRAINING AND EXPERIENCE ON CHILD EXPLOITATION OFFENSES, COMPUTERS, THE WORLDWIDE INTERNET COMPUTER COMMUNICATION NETWORK, AND DEFINITION OF TERMS

13. In this affidavit, the terms "minor," "sexually explicit conduct," "visual depiction," "producing," and "child pornography" are defined as set forth in 18 U.S.C. § 2256. The term "computer" is defined as set forth in 18 U.S.C. § 1030(e)(1).

14. Based upon my training and experience in the investigation of child pornography, and information related to me by other law enforcement officers involved in the investigation of child pornography, I know the following information about the use of computers with child pornography:

15. <u>Computers and Child Pornography</u>. Computers and computer technology have revolutionized the way in which child pornography is produced, distributed, and utilized. Child pornographers can now produce both still and moving images directly from a common video camera and can convert these images into computer-readable formats. The use of digital technology has enabled child pornographers to electronically receive, distribute, and possess large numbers of child exploitation images and videos with other Internet users worldwide.

16. <u>File Storage</u>. Computer users can choose their method of storing files: either on a computer's hard drive, an external hard drive, a memory card, a USB thumb drive, a smart phone or other digital media device, etc. (i.e., "locally") or on virtual

servers accessible from any digital device with an Internet
connection (i.e., "cloud storage").  Computer users frequently
transfer files from one location to another, such as from a
phone to a computer or from cloud storage to an external hard
drive.  Computer users also often create "backup," or duplicate,
copies of their files.  In this way, digital child pornography
is extremely mobile and such digital files are easily reproduced
and transported.  For example, with the click of a button,
images and videos containing child pornography can be put onto
external hard drives small enough to fit onto a keychain.  Just
as easily, these files can be copied onto compact disks and/or
stored on mobile digital devices, such as smart phones and
tablets.  Furthermore, even if the actual child pornography
files are stored on a "cloud," files stored in this manner can
only be accessed via a digital device.  Therefore, viewing this
child pornography would require a computer, smartphone, tablet,
or some other digital device that allows the user to access and
view files on the Internet.

        17.  Internet.  The term "Internet" is defined as the
worldwide network of computers -- a noncommercial, self-
governing network devoted mostly to communication and research
with roughly 500 million users worldwide.  The Internet is not
an online service and has no real central hub.  It is a
collection of tens of thousands of computer networks, online
services, and single user components.  In order to access the
Internet, an individual computer user must use an access
provider, such as a university, employer, or commercial Internet

Service Provider ("ISP"), which operates a host computer with direct access to the Internet.

18.  <u>Internet Service Providers</u>.  Individuals and businesses obtain access to the Internet through ISPs.  ISPs provide their customers with access to the Internet using telephone or other telecommunications lines; provide Internet e-mail accounts that allow users to communicate with other Internet users by sending and receiving electronic messages through the ISPs' servers; remotely store electronic files on their customer's behalf; and may provide other services unique to each particular ISP.  ISPs maintain records pertaining to the individuals or businesses that have subscriber accounts with them.  Those records often include identifying and billing information, account access information in the form of log files, e-mail transaction information, posting information, account application information, and other information both in computer data and written record format.

19.  <u>IP Addresses</u>.  An Internet Protocol address ("IP Address") is a unique numeric address used to connect to the Internet.  An IPv4 IP Address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).  In simple terms, one computer in a home may connect directly to the Internet with an IP Address assigned by an ISP.  What is now more typical is that one home may connect to the Internet using multiple digital devices simultaneously, including laptops, tablets, smart phones, smart televisions, and gaming systems, by way of example.  Because the home subscriber typically only has

one Internet connection and is only assigned one IP Address at a time by their ISP, multiple devices in a home are connected to the Internet via a router or hub.  Internet activity from every device attached to the router or hub is utilizing the same external IP Address assigned by the ISP.  The router or hub "routes" Internet traffic so that it reaches the proper device. Most ISPs control a range of IP Addresses.  The IP Address for a user may be relatively static, meaning it is assigned to the same subscriber for long periods of time, or dynamic, meaning that the IP Address is only assigned for the duration of that online session.  Most ISPs maintain records of which subscriber was assigned which IP Address during an online session.

## V.  TRAINING AND EXPERIENCE ON SOCIAL MEDIA

20.  Based on my training and experience, knowledge of the investigation, information provided by other law enforcement officers, and review of publicly available information, I know that:

### A.  Snapchat

21.  Snap, Inc. is a company located in Santa Monica, California that handles hundreds of millions of messages (also known as "snaps") every day through the application Snapchat. When messages or "snaps" are sent over the Snapchat network they are able to be opened and viewed by the recipient Snapchat user. Once the snap is opened, it remains viewable for a period of one to ten seconds (exact time is decided by the sender) before the snap is permanently deleted from the recipient's account.  In

this way, Snapchat users can send one-time, expiring messages to each other that contain photos and text.

22.   I know from my investigations that individuals with a sexual interest in children often use applications such as Snapchat for a number of reasons.  One, Snapchat is often used by children.  Two, it helps conceal illicit sexual conduct because of the nature of the disappearing messages.  Three, there are minimal, if any, verification requirements which allows false online identities to be more easily created and maintained.

   **B.   Instagram**

23.   Instagram owns and operates a free-access social-networking website.  Instagram allows its users to create their own profile pages, which can include a short biography, or "bio," a photo of themselves, and other information.  Users can access Instagram through the Instagram website or by using a special electronic application ("app") created by the company that allows users to access the service through a mobile device.

24.   Instagram permits users to post photos and videos to their profiles on Instagram and otherwise share photos and videos with others on Instagram, as well as certain other social-media services, including Flickr, Facebook, and Twitter.  When posting or sharing a photo or video on Instagram, a user can add the following to the photo/video: a caption; various "tags" that can be used to search for the photo/video (e.g., a user may add the tag "#vw" so that people interested in Volkswagen vehicles can search for and find the photo/video);

location information, including geotags or a specific location name; and other information.  A user can also apply a variety of "filters" or other visual effects that modify the look of the posted photos and videos.  In addition, Instagram allows users to make comments on posted photos and videos, including photos and videos that the user posts or photos and videos posted by other users of Instagram.  Users can also "like" photos and videos, meaning that they can express approval of a photo or video by using Instagram's "like" feature.

25.  Instagram allows users to have "friends," which are other individuals with whom the user can share information without making the information public.  Friends on Instagram may come from either contact lists maintained by the user, other third-party social media websites and information, or searches conducted by the user on Instagram profiles.  Instagram collects and maintains this information.

26.  Instagram also allows users to "follow" another user, which means that they receive updates about posts made by the other user.  Users may also "unfollow" users, that is, stop following them or block them, which prevents the blocked user from following that user.

27.  Instagram allows users to post and share various types of user content in their galleries, including photos, videos, captions, comments, and other materials.  Such items can contain metadata, i.e., content about the data such as the date and time the photo or video was taken.  Instagram collects and maintains

user content that users post to Instagram or share through
Instagram.

28.  Instagram users may send photos and videos to select
individuals or groups via Instagram Direct.  Information sent
via Instagram Direct does not appear in a user's feed, search
history, or profile.

### C.  FaceTime

29.  FaceTime is an Apple application that allows users to
video or audio chat.  FaceTime can, but does not require,
cellular data to function; it can operate on wifi alone.  The
content of FaceTime communications is not typically preserved,
although there are methods for users to record the
conversations.  Apple does, however, often preserve data
associated with the chats, such as time, duration, and
participants.

## VI. <u>STATEMENT OF PROBABLE CAUSE</u>

30.  Based on my review of law enforcement reports,
conversations with other law enforcement agents, and my own
knowledge of the investigation, I am aware of the following:

### A.  Minor Victim's mother reports her missing and identifies SMITH

31.  On or about July 10, 2020, Minor Victim's mother
reported Minor Victim missing to the National Center for Missing
and Exploited Children ("NCMEC") after she found a note in Minor
Victim's room saying Minor Victim was going out and would return
soon, but Minor Victim never returned; Minor Victim did not have
a history of running away.  In the report, Minor Victim's mother

said Minor Victim had a wifi-capable cellphone, but no number assigned to it.  NCMEC assigned the tip to the Roseburg (Oregon) Police Department ("RPD"), who requested assistance from the FBI.

32.  That same day, on or about the July 10, 2020, FBI Portland and RPD met with Minor Victim's mother and learned the following:

    a.   Minor Victim met a man online, who initially claimed he was 16 years-old, and sent him nude photos of herself.

    b.   When Minor Victim attempted to cut off communication, the man threatened to distribute her nude photos.

    c.   Minor Victim's mother provided investigators with screenshots from SMITH's Facebook account.  She also provided Minor Victim's Instagram and Snapchat user handles.

33.  Through open source investigation based in part on the information Minor Victim's mother provided about the various social media account, FBI Portland discovered a likely Instagram account for SMITH.

34.  The RPD detective who interviewed Minor Victim's mother told me the screenshots Minor Victim's mother provided to him from SMITH's social media appear consistent with SMITH's DMV photo.

35.  That same day, investigators interviewed a minor female friend ("Minor Friend") of Minor Victim's.  Minor Friend said Minor Victim told her about Minor Victim's online communications with SMITH.  Minor Victim told her SMITH was

12

"super controlling and possessive," even to the point of logging into Minor Victim's social media accounts to monitor and control Minor Victim's messages; SMITH would become upset if Minor Victim communicated with any other males.  Minor Friend said SMITH eventually told Minor Victim he was coming to Oregon to "prove it" to Minor Victim that he was serious.

**B.   SMITH traveled from Los Angeles to Oregon and Back between July 6 and 7, 2020**

36.   To find Minor Victim and SMITH and pursuant to 18 U.S.C. § 2702, FBI Portland and RPD served requests for emergency disclosures on various social media companies likely used by SMITH and Minor Victim; emergency disclosures allow the FBI during exigent situations to quickly obtain limited subscriber information from companies for accounts associated with the exigency.  In response, Instagram returned an IP address, owned by Sprint, on an account likely belonging to SMITH.  FBI Portland then submitted an exigent request to Sprint for that IP address, and Sprint returned an associated cellphone number.

37.   Now having SMITH's cellphone number, FBI's Cellular Analysis Survey Team ("CAST") requested historical cell site data and prospective location data ("pings") to locate the SUBJECT DEVICE.  The historical cell site data for SMITH'S Phone showed that it left the Los Angeles area on July 6, 2020, around 10:30 p.m. and traveled north.  The SUBJECT DEVICE arrived in the vicinity of Minor Victim's home in Oregon on July 7, 2020, around 11:12 a.m. and left the area around 11:51 a.m.  The

SUBJECT DEVICE then began to travel south towards California. Eventually it pinged in an area proximate to the City West and West Lake areas of Los Angeles, within the Los Angeles Police Department ("LAPD") Rampart Community Police Station's area of responsibility.

**C.   SMITH is located and avoids answering questions about Minor Victim**

38.   In the early morning hours of Saturday, July 11th, FBI Portland alerted FBI Los Angeles about Minor Victim being missing, and FBI Los Angeles engaged local LAPD Task Force Officers ("TFOs") to assist in locating Minor Victim.  Shortly after 6:00 a.m., agents and TFOs initiated surveillance in the vicinity of the most recent "pings."  Simultaneously, agents conducted an open source query of publically-available databases to try to find SMITH's exact address.  The result showed a possible address for SMITH at an apartment complex located within the area bounded by the geographic cone enclosed by the "ping" at 130 South Lafayette Park Place, Los Angeles, California 90059.

39.   Agents and TFOs began to canvass the residence of the apartments in the complex, displaying a DMV photograph of SMITH. One resident identified SMITH and provided the apartment number where the resident believed SMITH lived.  Agents knocked on the door of the apartment ("The Subject Premises").  A child initially answered but, following a delay, an Adult Female ("Adult Female") came to the door.

40.   Using the DMV photo, Adult Female identified SMITH as her husband, but said he was not home.   She also identified a photo of Minor Victim, and said Minor Victim was staying in the Subject Premises, but was not now there.

41.   Adult Female consented to investigators entering Subject Premises to look for SMITH and Minor Victim.   Neither Minor Victim nor SMITH were there.   Later, Adult Female acknowledged that Minor Victim was present in the Subject Premises when FBI agents initially knocked, but had left through another apartment door when the FBI announced their presence.

42.   SMITH returned to the apartment shortly thereafter and voluntarily agreed to be interviewed.

43.   SMITH initially said he met the female that was staying in the apartment in the McArthur Park area, which is near SMITH's apartment, where she was from.

44.   SMITH consented to agents searching his cellphone (the SUBJECT DEVICE).   In a review of the photo gallery on SMITH'S phone, agents found photographs of the Minor Victim.   SMITH acknowledged that this was the girl that was staying in the Subject Premise, and that he had travelled to Oregon to pick her up; he also said they were in a relationship.

45.   SMITH said he believed Minor Victim was 19 years-old and, when told that Minor Victim was actually 15 years-old, said he would "probably go to jail now."

46.   SMITH said he chatted with Minor Victim primarily over Instagram and Snapchat.   Agents asked to see those apps on the

Subject Device.  SMITH said he had deleted them, but would not say when or why he had deleted them.

47.  When asked whether he and the victim had engaged in sexual encounters, SMITH became evasive and uncomfortable, and refused to answer the question.

48.  Shortly before SMITH's voluntary interview ended, agents seized the Subject Device because it contained photographic evidence of Minor Victim, who was then still missing.

**D.  After being rescued, Minor Victim reveals SMITH threatened to "shoot up" her house if she did not come to Los Angeles with him; while together, SMITH threatened to kill her and her family, beat her, and had sex with her multiple times**

49.  Approximately four hours after agents knocked on SMITH's door, they found Minor Victim.  Minor Victim had hidden in the apartment complex's parking structure during the initial sweep and thereafter hid on the building's roof, where she remained until being located.

50.  Investigators briefly spoke with her, but she was dirty and wearing no shoes, so shortly thereafter LAPD transported her to the Rampart Community Police Station to provide her with some care.  Minor Victim was provided with care and asked to call her family.

51.  After Minor Victim was cared for, my partner and I began to interview her.  She was hesitant to answer our questions.  She would not refer to SMITH by name and denied being a relationship with him; she appeared uncomfortable and upset when we questioned her about SMITH.  When asked about

bruising on her neck, she said the marks came from an acquaintance of SMITH's, not SMITH.[1]  About twenty minutes into the interview, Minor Victim called her parents.  After the call, Minor Victim's attitude significantly changed, and she explained the following:

    a.    Minor Victim said she was initially afraid to talk to investigators because she feared for her family's safety.  Following the call to her parents, during which Minor Victim learned her parents were not in danger, Minor Victim expressed a willingness to answer any of the Agent's questions.

    b.    She came to Los Angeles about four days ago.[2] Since then, she had been staying at the Subject Premises, which SMITH'S wife, Adult Female, owns.

    c.    When the FBI first knocked, Minor Victim was in the shower.  Adult Female told Minor Victim to hide because the FBI was at the door.  Minor Victim then left the apartment through another door.

    d.    Minor Victim has been chatting with SMITH for a "long amount of time" over Snapchat, Instagram, and Facetime.

    e.    Even before chatting, SMITH knew Minor Victim was fifteen.  Before SMITH and Minor Victim started chatting, Minor

---

[1] On July 11, 2020, a minor male ("Minor Male") saw law enforcement searching for Minor Victim at SMITH's apartment complex.  Minor Female initially gave Minor Male's name to my partner and me as the individual who had given her the marks on her neck.  When Minor Male was questioned at the scene about Minor Female, he said he knew her, but they had very little contact because SMITH was controlling of Minor Female.

[2] The pings indicate Minor Victim and SMITH arrived in the Los Angeles area on July 7th.

Victim was dating an online acquaintance of SMITH's who told
SMITH she was fifteen.  Minor Victim also told SMITH herself she
was fifteen.  Initially, Minor Victim thought SMITH was younger,
based on his online behavior, but then she realized he was older
as his behavior changed.

      f.  Before they met in person, Minor Victim sent
SMITH explicit images and videos of herself at his insistence;
she engaged in explicit live video chats over FaceTime.  In the
beginning, Minor Victim sent images of just her cleavage, but
eventually sent images of herself completely nude.  If Minor
Victim refused to "do stuff" on their Facetime calls, SMITH
would get mad.  During these Facetime video calls, SMITH was
"very bossy" in telling Minor Victim what to do.  SMITH became
increasingly verbally threatening over time.  Before meeting in
person, Minor Victim attempted to break up with SMITH multiple
times.

      g.  Minor Victim said SMITH came to Oregon to get her
so she could run away with him and they could start a life
together in Los Angeles.  She said she and SMITH are in a
relationship, she has strong feelings for him, and thinks she is
in love with him.  She explained that when SMITH is being
"normal" and not angry, he treats her "gentle and sweet,"
calling her "baby" and "princess;" she also said he takes Xanax.

      h.  On the morning of July 7, 2020, SMITH arrived
with two unidentified males to pick up Minor Victim.  SMITH
drove there from Los Angeles to pick her up and then drive her
back to Los Angeles.  Minor Victim had previously expressed

hesitancy about leaving, but SMITH threatened her and her family if she refused to comply.  Specifically, SMITH threatened to "shoot up her house" if she did not go with him.  Minor Victim stated that if SMITH had not threatened her or her family, she would not have left with him and driven to Los Angeles.  SMITH threatened to "beat up" Minor Victim and to put a "bullet" in her brain if she did not do what he told her to do.

      i.   SMITH threatened Minor Victim "a lot."  At some point, SMITH said he was going to get a motel room to have sex with Minor Victim for the first time; later, when he was angry with her, he said she would not make it out alive.  SMITH never got a motel room.  He also threatened to kill or stab her when he became angry.

      j.   On the drive to Los Angeles, SMITH took Minor Victim's phone and factory reset it, which functionally erases all data off a device.  After resetting it, he threw it out the window.

      k.   Soon after Minor Victim and SMITH got to Los Angeles, Minor Victim said they had sex for the first time.  This was Minor Victim's first time having sex.  Although Minor Victim said the sex was "consensual," she also said SMITH hit her while they were having sex; she said hitting her during sex is one of SMITH'S "kinks."[3]  Minor Victim later accidentally stepped on SMITH'S shoes.  SMITH grabbed her by the throat, pulled her into the bedroom, and slammed her against the wall.

---

[3] As described further below, Minor Victim also said SMITH "forced" his penis down her throat.

The last time that Minor Victim and SMITH had sex was the night of July 10th.  Minor Victim also reported that SMITH told her that they had engaged in some intimate behavior on the drive to Los Angeles, but she did not remember it; later, as described further below, Minor Victim also reported that SMITH told her he had anally penetrated her on the drive down at a rest stop, but, again, she did not remember this incident.

l.    While in Los Angeles, Minor Victim tried to call home, but SMITH told her she could not talk to her family until she was at least 18 years-old.  Minor Victim attempted on three different occasions to leave the Subject Premises by herself, but SMITH would not allow her to leave.  When SMITH discovered Minor Victim had a second cellphone, he took it and threw it in the trash.

m.    SMITH told Minor Victim since her disappearance her mother had sent him text messages and requested to follow SMITH on Instagram.[4]  Minor Victim asked to see the messages, but SMITH refused.

### E.   A forensic examination reveals SMITH beat, burned, and repeatedly penetrated Minor Victim

52.  Following Minor Victim's interview, Minor Victim was transported to LAC & USC Medical Center to undergo a forensic physical examination called a Minor Victim Acute (<72 Hours) Forensic Medical Report, Adolescent Sexual Assault Examination. As a part of this examination, medical personnel took swabs from

---

[4] Minor Victim's mother attempted to conduct a number of investigatory steps on her own in an effort to locate her daughter, including sending these communications to SMITH without the involvement of law enforcement.

Minor Victim's body; those swabs are now in FBI custody, but have not been sent off for analysis.  A report from the exam indicated the following about SMITH and Minor Victim's physical encounters:

      a.   <u>Assault History</u>

         i.   "He hit me on the face and ribs."

         ii.  "He held me down, pinning my wrists and grabbing my legs."

         iii. "He put his hands around my neck."

         iv.  "We were just sitting on the bed and he burned me with a lighter."

         v.   My throat hurts because of the pressure he put on it.

         vi.  "Sore from him forcing himself down my throat."

         vii. "He said he would kill my family if I didn't go with him."

         viii.   "He said he was going to kill me."

         ix.  He "shotgun[ed] me with weed."[5]

         x.   I vomited because he got me "really high."

      b.   <u>Sex Acts Described by Patient.</u>

         i.   Penial and digital penetration of vagina.

         ii.  "He said he put his penis in my butt when we were at the rest stop."

---

[5] "Shotgunning" refers to when one person forces marijuana smoke into another person's mouth.

iii. Non-genital licking, kissing, suction, and biting.

iv.  Ejaculation on mouth, vagina, body, and clothing.

iv. Condoms were not used.  Lubricant was used three to five times.

  c. <u>Physical Examination</u>

   i. Faded suction injuries were observed around the neck and chest area.

   ii. A red scab by back of left hip, consistent with a cigarette lighter burn.

   iii. Faded green bruises below shoulders and upper back.

   iv. A Wood Lamp[6] discoloration on right buttock.

   v. Pinkish marks indicative of suction injuries on left side of neck and suction injuries on right side of neck.

   vi. Redness at back of throat, possibly from oral copulation.

   vii. Cervix reddish "all around the clock,"[7] but no evidence of injury.

**F. SMITH is arrested**

53. On July 11, 2020, the FBI arrested SMITH for the above-described conduct.  SMITH was detained at the Monterey Park Police Department.  While there, he vomited and complained of chest pains.  He was taken to Garfield Medical Center for evaluation and medically discharged; he returned to Monterey Park and is still there.

---

 [6] A "Wood Lamp" test uses UV light to look closely at the skin.

 [7] "All around the clock" is medical shorthand for 360 degrees, or all the way around an orifice.

## VII. <u>TRAINING AND EXPERIENCE ON INDIVIDUALS WHO HAVE A SEXUAL INTEREST IN CHILDREN</u>

54.   Based on my training and experience, and the training and experience of other law enforcement officers with whom I have had discussions, I have learned that there are certain characteristics common to individuals with a sexual interest in children and images of children:

a.   Individuals who have a sexual interest in children or images of children may receive sexual gratification, stimulation, and satisfaction from contact with children; or from fantasies they may have viewing children engaged in sexual activity or in sexually suggestive poses, in person, in photographs, or in other visual media; or from literature describing such activity.

b.   Individuals who have a sexual interest in children or images of children may collect sexually explicit or suggestive materials in a variety of media, including photographs, magazines, motion pictures, videotapes, books, slides, and/or drawings or other visual media.  Individuals who have a sexual interest in children or images of children oftentimes use these materials for their own sexual arousal and gratification.  Further, they may use these materials to lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts.

c.   Individuals who have a sexual interest in children or images of children sometimes possess hard copies of

child pornography, such as pictures, films, video tapes, magazines, negatives, photographs, etcetera. As digital technology has developed, individuals with a sexual interest in children or images of children have become much more likely to maintain child pornography in digital or electronic format, stored either on digital devices or in remote storage locations on the Internet. Regardless of whether these individuals collect their child pornography in hard copy or digital format, they may maintain their child pornography for a long period of time, even years. They usually maintain these collections in a safe, secure, and private environment, such as their homes, vehicles, or nearby, so they can view the child pornography at their leisure. These collections are typically highly valued.

d.    Individuals who have a sexual interest in children or images of children also may correspond with and/or meet others to share information and materials; rarely destroy correspondence from other child pornography distributors and collectors; may conceal such correspondence as they do their sexually explicit material; and often maintain lists of names, addresses, and telephone numbers of individuals with whom they have been in contact and who share the same interests in child pornography.

e.    Individuals who have a sexual interest in children or images of children prefer not to be without their child pornography for any prolonged time period. This behavior has been documented by law enforcement officers involved in the investigation of child pornography throughout the world.

f.   Based on my training and experience, as well as my conversations with digital forensics agents, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via computer.  Electronic files downloaded to a hard drive can be stored for years at little to no cost.  Even when such files have been deleted, they may be recoverable months or years later using readily available forensic tools. When a person "deletes" a file on a home computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space -- that is, in space on the hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.  Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or cache.  The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages.  Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits.  Because computer

evidence is recoverable after long periods of time, there is probable cause to believe that evidence of the SUBJECT OFFENSES will be found on the SUBJECT DEVICES.

### VIII.    TRAINING AND EXPERIENCE ON DIGITAL DEVICES

55.  As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.  Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of digital devices, I know that data in digital form can be stored on a variety of digital devices and that during the search of a premises it is not always possible to search digital devices for digital data for a number of reasons, including the following:

a.   Searching digital devices can be a highly technical process that requires specific expertise and

specialized equipment.  There are so many types of digital devices and software programs in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search.  In addition, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched.

b.    Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data.  As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

c.    The volume of data stored on many digital devices will typically be so large that it will be highly impractical to search for data at one time.  A single megabyte of storage space is the equivalent of 500 double-spaced pages of text.  A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text.

d.    Electronic files or remnants of such files can be recovered months or even years after they have been downloaded

onto a hard drive, deleted, or viewed via the Internet.[8] Electronic files saved to a hard drive can be stored for years with little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. Normally, when a person deletes a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space, i.e., space on a hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space, for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a swap or recovery file. Similarly, files that have been viewed on the Internet are often automatically downloaded into a temporary directory or cache. The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently downloaded or viewed content. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits. Recovery of residue of electronic files from a hard drive

---

[8] These statements do not generally apply to data stored in volatile memory such as random-access memory, or "RAM," which data is, generally speaking, deleted once a device is turned off.

requires specialized tools and a controlled laboratory
environment.  Recovery also can require substantial time.

       e.  Although some of the records called for by this
warrant might be found in the form of user-generated documents
(such as word processing, picture, and movie files), digital
devices can contain other forms of electronic evidence as well.
In particular, records of how a digital device has been used,
what it has been used for, who has used it, and who has been
responsible for creating or maintaining records, documents,
programs, applications and materials contained on the digital
devices are, as described further in the attachments, called for
by this warrant.  Those records will not always be found in
digital data that is neatly segregable from the hard drive image
as a whole.  Digital data on the hard drive not currently
associated with any file can provide evidence of a file that was
once on the hard drive but has since been deleted or edited, or
of a deleted portion of a file (such as a paragraph that has
been deleted from a word processing file).  Virtual memory
paging systems can leave digital data on the hard drive that
show what tasks and processes on the computer were recently
used.  Web browsers, e-mail programs, and chat programs often
store configuration data on the hard drive that can reveal
information such as online nicknames and passwords.  Operating
systems can record additional data, such as the attachment of
peripherals, the attachment of USB flash storage devices, and
the times the computer was in use.  Computer file systems can
record data about the dates files were created and the sequence

in which they were created.  This data can be evidence of a
crime, indicate the identity of the user of the digital device,
or point toward the existence of evidence in other locations.
Recovery of this data requires specialized tools and a
controlled laboratory environment, and also can require
substantial time.

       f.    Further, evidence of how a digital device has
been used, what it has been used for, and who has used it, may
be the absence of particular data on a digital device.  For
example, to rebut a claim that the owner of a digital device was
not responsible for a particular use because the device was
being controlled remotely by malicious software, it may be
necessary to show that malicious software that allows someone
else to control the digital device remotely is not present on
the digital device.  Evidence of the absence of particular data
on a digital device is not segregable from the digital device.
Analysis of the digital device as a whole to demonstrate the
absence of particular data requires specialized tools and a
controlled laboratory environment, and can require substantial
time.

       g.    Digital device users can attempt to conceal data
within digital devices through a number of methods, including
the use of innocuous or misleading filenames and extensions.
For example, files with the extension ".jpg" often are image
files; however, a user can easily change the extension to ".txt"
to conceal the image and make it appear that the file contains
text.  Digital device users can also attempt to conceal data by

31

using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form.  In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography."  For example, by using steganography a digital device user can conceal text in an image file that cannot be viewed when the image file is opened. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband or instrumentalities of a crime.  In addition, decryption of devices and data stored thereon is a constantly evolving field, and law enforcement agencies continuously develop or acquire new methods of decryption, even for devices or data that cannot currently be decrypted.

56.  I know from my training and experience and my review of publicly available materials that several hardware and software manufacturers offer their users the ability to unlock their devices through biometric features in lieu of a numeric or alphanumeric passcode or password.  These biometric features include fingerprint-recognition, face-recognition, iris-recognition, and retina-recognition.  Some devices offer a combination of these biometric features and enable the users of such devices to select which features they would like to utilize.

57.   If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints.  For example, Apple Inc. ("Apple") offers a feature on some of its phones and laptops called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device.  Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which on a cell phone is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the phone, and on a laptop is located on the right side of the "Touch Bar" located directly above the keyboard.  Fingerprint-recognition features are increasingly common on modern digital devices.  For example, for Apple products, all iPhone 5S to iPhone 8 models, as well as iPads (5th generation or later), iPad Pro, iPad Air 2, and iPad mini 3 or later, and MacBook Pro laptops with the Touch Bar are all equipped with Touch ID.  Motorola, HTC, LG, and Samsung, among other companies, also produce phones with fingerprint sensors to enable biometric unlock by fingerprint.  The fingerprint sensors for these companies have different names but operate similarly to Touch ID.

58.   If a device is equipped with a facial-recognition feature, a user may enable the ability to unlock the device through his or her face.  To activate the facial-recognition feature, a user must hold the device in front of his or her face.  The device's camera analyzes and records data based on the user's facial characteristics.  The device is then

automatically unlocked if the camera detects a face with characteristics that match those of the registered face.  No physical contact by the user with the digital device is necessary for the unlock, but eye contact with the camera is often essential to the proper functioning of these facial-recognition features; thus, a user must have his or her eyes open during the biometric scan (unless the user previously disabled this requirement).  Several companies produce digital devices equipped with a facial-recognition-unlock feature, and all work in a similar manner with different degrees of sophistication, e.g., Samsung's Galaxy S8 (released Spring 2017) and Note8 (released Fall 2017), Apple's iPhone X (released Fall 2017).  Apple calls its facial-recognition unlock feature "Face ID."  The scan and unlock process for Face ID is almost instantaneous, occurring in approximately one second.

59.  While not as prolific on digital devices as fingerprint- and facial-recognition features, both iris- and retina-scanning features exist for securing devices/data.  The human iris, like a fingerprint, contains complex patterns that are unique and stable.  Iris-recognition technology uses mathematical pattern-recognition techniques to map the iris using infrared light.  Similarly, retina scanning casts infrared light into a person's eye to map the unique variations of a person's retinal blood vessels.  A user can register one or both eyes to be used to unlock a device with these features.  To activate the feature, the user holds the device in front of his or her face while the device directs an infrared light toward

34

the user's face and activates an infrared-sensitive camera to
record data from the person's eyes.  The device is then unlocked
if the camera detects the registered eye.  Both the Samsung
Galaxy S8 and Note 8 (discussed above) have iris-recognition
features.  In addition, Microsoft has a product called "Windows
Hello" that provides users with a suite of biometric features
including fingerprint-, facial-, and iris-unlock features.
Windows Hello has both a software and hardware component, and
multiple companies manufacture compatible hardware, e.g.,
attachable infrared cameras or fingerprint sensors, to enable
the Windows Hello features on older devices.

60.  In my training and experience, users of electronic
devices often enable the aforementioned biometric features
because they are considered to be a more convenient way to
unlock a device than entering a numeric or alphanumeric passcode
or password.  Moreover, in some instances, biometric features
are considered to be a more secure way to protect a device's
contents.

61.  I also know from my training and experience, as well
as from information found in publicly available materials
including those published by device manufacturers, that
biometric features will not unlock a device in some
circumstances even if such features have been enabled.  This can
occur when a device has been restarted or inactive, or has not
been unlocked for a certain period of time.  For example, with
Apple's biometric unlock features, these circumstances include
when: (1) more than 48 hours has passed since the last time the

35

device was unlocked; (2) the device has not been unlocked via Touch ID or Face ID in eight hours and the passcode or password has not been entered in the last six days; (3) the device has been turned off or restarted; (4) the device has received a remote lock command; (5) five unsuccessful attempts to unlock the device via Touch ID or Face ID are made; or (6) the user has activated "SOS" mode by rapidly clicking the right side button five times or pressing and holding both the side button and either volume button.  Biometric features from other brands carry similar restrictions.  Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.  I do not know the passcodes of the devices likely to be found during the search.

62.  For these reasons, the warrant I am applying for would permit law enforcement personnel to: (1) compel the use of TRAVIS SMITH's thumb- and/or fingerprints on the device(s); and (2) hold the device(s) in front of SMITH's face with his eyes open to activate the facial-, iris-, and/or retina-recognition feature.  With respect to fingerprint sensor-enabled devices, although I do not know which of the fingers are authorized to access any given device, I know based on my training and experience that it is common for people to use one of their thumbs or index fingers for fingerprint sensors; and, in any event, all that would result from successive failed attempts is the requirement to use the authorized passcode or password.

63.   Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## I.  CONCLUSION

64.   For all of the reasons described above, there is probable cause to believe that Travis SMITH has committed the SUBJECT OFFENSES. There is also probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT DEVICE described in Attachment A.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 13th day of
July, 2020.

_____
UNITED STATES MAGISTRATE JUDGE
 JEAN P. ROSENBLUTH